UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
PAMELA R. WASHINGTON,                                :

                          Plaintiff,                   :          13cv1264 (CM) (DCF)

     -against-                                          :          **REPORT AND**
                                                  **RECOMMENDATION**

                                           :
CAROLYN W. COLVIN
Acting Commissioner of Social Security,            :

                         Defendant.                 :
-------------------------------------------------------------X

**TO THE HONORABLE COLLEEN MCMAHON, U.S.D.J.:**

Plaintiff Pamela Washington ("Plaintiff") seeks review of the final decision of the Acting Commissioner of Social Security ("Defendant" or the "Commissioner"), denying Plaintiff Supplemental Security Income ("SSI") under the Social Security Act (the "Act") on the ground that Plaintiff's impairments did not constitute a disability for the purposes of the Act.  Plaintiff has moved, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings reversing the decision of the Commissioner (Dkt. 12), and Defendant has cross-moved for judgment on the pleadings affirming that decision (Dkt. 16).

For the reasons set forth below, I respectfully recommend (a) that Plaintiff's motion be granted, to the extent that Plaintiff requests that her claim be remanded for further consideration of her mental impairments, and (b) that Defendant's cross-motion be denied.

# BACKGROUND

Plaintiff applied for SSI on April 28, 2010 (*see* R. at 161-67), alleging that she was disabled due to bipolar disorder with psychotic features, post-traumatic stress disorder and cocaine and alcohol dependence (*id*. at 187).  In the course of her administrative proceedings, she also seemed to claim disability based on certain physical conditions, most specifically alleged pain and numbness in her hands.  (*See id*. at 41.)

The background facts set forth herein are taken from the administrative record (referred to herein as "R."), which includes, *inter alia,* Plaintiff's medical records and the transcript of the May 18, 2011 hearing held before Administrative Law Judge Glenn G. Meyers (the "ALJ"), at which Plaintiff testified.

### A.    Medical Evidence

The relevant medical evidence in the administrative Record may be summarized as follows:[1]

### 1.    Treatment Records

#### a.    North General Hospital (July 13-22, 2009)

Plaintiff was admitted to North General Hospital from July 13 through 22, 2009. (*See id*. 234-61.)  It appears from the medical records that she first presented to the hospital's Emergency Department with complaints of depression and hearing voices, and that she was suffering from "vague suicidal ideations," "mild dizziness," and headaches.  (*Id*. at 236, 239.) The hospital records indicate a medical diagnosis of "substance induced mood/Psychotic

---

[1] This summary is intended to focus primarily on the conditions that form the basis of Plaintiff's claimed disability.  The Court has, therefore, generally omitted references to the medical records, where they mention certain other conditions that Plaintiff may have had – such as "alopecia areata" (a form of hair loss).  (*See* R. at 279.)

Disorder" and note that major depressive or bipolar disorder with psychotic features would need to be ruled out.  (*Id.* at 241.)  The same records also reference "methadone maintenance, alcohol dependence, [and] cocaine abuse" (*id.*), although it is unclear whether these were confirmed or suspected (*see id.*; *see also id.* at 245 ("substance induced psychotic disorder vs. major depressive disorder [with] psychotic features vs. bipolar disorder [with] psychotic features")).

Plaintiff appears to have been discharged on July 22, 2009 with a referral to a walk-in clinic and "no restrictions" with respect to activities.  (*Id.* at 235.)

### b. St. Barnabas Hospital (August 3-4, 2009)

On August 3, 2009, Plaintiff was taken to the Emergency Department at St. Barnabas Hospital, after reportedly threatening her neighbor.  (*Id.* at 262-63.)  According to the physician's notes, Plaintiff stated that she had been drinking alcohol constantly for several days prior, and complained that she was uncomfortable because something out of the ordinary was "happening to her body" and she was "hearing voices."  (*Id.* at 263.)  The physician diagnosed Plaintiff with schizophrenia (*id.* at 265; *see also id.* at 263), and discharged Plaintiff on August 4, 2009 (*id.* at 264).

### c. Bronx-Lebanon Hospital (September 2009-June 2011)

The Record reflects that, on various dates between September 2009 and April 2010, possibly in connection with a drug treatment program (although this is not clear), Plaintiff underwent a number of screening tests for cocaine, opiates, and other illegal drugs, at the Martin Luther King Jr. Health Center of Bronx-Lebanon Hospital ("Bronx-Lebanon") (*see id.* at 282-303); these tests consistently showed negative results (*see id.*).

On March 23, 2010, Plaintiff went to the Emergency Department at Bronx-Lebanon.  (*Id.* at 314.)  In the "Emergency Triage" record from that day, Plaintiff's chief complaints were

recorded as "pain and numbness to both hands" that had lasted for two weeks, depression, and

hearing voices.  (*Id*. at 319.)  In the record labeled "Neuro Symptoms" from that day, Plaintiff's

chief complaint was recorded as "tingling in [her] fingertips."  (*Id*. at 314.)  Plaintiff was

diagnosed by Dr. Tania Mariani with "paresthesias"[2] in both hands and discharged with

instructions to follow up.  (*Id.* at 318.)

At a follow-up appointment on April 21, 2010, Plaintiff was seen by Dr. James R. Morris.

(*See id*. at 300.)  Plaintiff again complained of numbness and tingling in both hands, stating that

she had experienced this for over 10 years, including while detoxing from methadone in 2009.

(*Id*. at 288.)  She also reported that she was not on medication for this problem and that it did not

cause her to drop things, but that her finger joints were stiff at times. (*Id.*)  Dr. Morris listed

"Arthritis" on Plaintiff's "Problem List," though he scored Plaintiff's motor function at five out

of five in all limbs and noted that she had "no deficits of sensation to touch, temperature,

vibration and proprioception."[3]  (*Id.*)  He also noted "no tremor or sign of dystonia,"[4] and a

normal "station and gait."  (*Id.*)  Dr. Morris's assessment called for X-rays of Plaintiff's hands, a

follow-up appointment one month later, and a trial prescription of Nabumetone (an anti-

---

[2] "Paresthesia refers to a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body." http://www.ninds.nih.gov/disorders/paresthesia/paresthesia.htm (last visited January 23, 2015).

[3] "Proprioception can be defined as a specialized variation of the sensory modality of touch that encompasses the sensation of joint movement (kinesthesia) and joint position (joint position sense)."  http://www.ncbi.nlm.nih.gov/pubmed/9006708 (last visited January 23, 2015).

[4] "Dystonia is a disorder characterized by involuntary muscle contractions that cause slow repetitive movements or abnormal postures." http://www.ninds.nih.gov/disorders/dystonias/detail_dystonias.htm (last visited, Jan. 13, 2015).

inflammatory medication),[5] "in an effort to minimize her symptoms." (*Id.* at 300.) Plaintiff filed

her application for SSI about a week after this appointment. (*See id.* at 161-67.)

The Record reflects that Plaintiff then had a second follow-up visit to Bronx-Lebanon on

June 7, 2010, where it appears that she was again seen by Dr. Morris. (*Id.* at 283-87.) During

that appointment, Plaintiff's "chief complaint" was numbness in her hands, but she apparently

reported that the Nabumetone had helped "ease the pain in both of her hands." (*Id.* at 283.) The

X-rays of Plaintiff's hands were found to be "unremarkable," and Plaintiff's motor function was

again described as five out of five in all limbs. (*Id.*) The summary signed (electronically) by

Dr. Morris stated that Plaintiff was "doing better." (*Id.* at 286.) He increased her dosage of

Nabumetone to ease some discomfort caused by inflammation, and gave her instructions for a

follow-up appointment in six or seven weeks. (*Id.*)

It appears that the Bronx-Lebanon records that were requested by the Social Security

Administration, in connection with Plaintiff's claim for benefits, were provided by Bronx-

Lebanon on July 11, 2010. (*See id.* at 282.) The Record is silent as to whether Plaintiff

continued to be seen there, after July 2010.

> ### d.    Montifiore Behavioral Care Center
> ### (August 2010-May 2011)
> ### (Treatment by Psychiatrist Imtiaz Ghumman)

On August 10, 2010, Plaintiff was seen by Dr. Imtiaz Ghumman, a psychiatrist at

Montefiore Behavioral Care Center, who outlined an "Initial/Comprehensive Treatment Plan"

for her. (*Id.* at 370.) Dr. Ghumman recorded, *inter alia*, depression/anxiety, mood swings,

---

[5] Nabumetone is a "nonsteroidal anti-inflammatory" medication that is "used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis . . . and rheumatoid arthritis." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692022.html (last visited on Jan. 23, 2015).

disturbed sleep, and "psychosocial stressors" as Plaintiff's "problems." (*Id*.) The treatment plan indicated that Plaintiff needed regular psychotherapy and medication management. (*Id*.) Dr. Ghumman assigned Plaintiff a global assessment of functioning ("GAF") score of 50.[6]

On December 23, 2010, Plaintiff completed a questionnaire for the Montefiore Sleep-Wake Disorders Center. (*See id*. at 359-69.) Plaintiff reported that she had difficulty falling and staying asleep, and a host of other problems related to sleep, including, *inter alia*, waking up with headaches, waking up choking or gasping for air, nightmares, daytime fatigue, mood changes, anxiety, irritability, and severe pain in her legs at night. (*See id*. at 359-63.) Plaintiff also reported feelings of depression and anxiety "nearly every day." (*Id*. at 365.)

On the part of the questionnaire that called for Plaintiff to list all medications that she was then using, Plaintiff listed, *inter alia*, one medication associated with the treatment of insomnia, Temazepam[7]; three medications that are generally used to treat psychiatric problems, specifically

---

[6] The GAF scale, a scale from 0 to 100, was previously used by clinicians to report their judgment of an individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. rev. 2000) ("DSM-IV"). A GAF of 41 to 50 meant an individual had "serious symptoms" or "any serious impairment in social occupational, or school functioning." *Id*. at 34. The most recent (2013) addition of the manual (the "DSM-V"), however, "has dropped the use of the [GAF] scale." *Restuccia v. Colving*, No. 13cv3294 (RMB), 2014 WL 4739318, at *8 (Sept. 22, 2014) (quoting *Mainella v. Colvin,* No. 13cv2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014)).

[7] Temazepam, commonly known by the brand name Restoril, is a benzodiazepine medication that is "used on a short-term basis to treat insomnia (difficulty falling asleep or staying asleep)." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684003.html (last visited on Jan. 23, 2015).

Risperidone,[8] Seroquel,[9] and Sertraline[10]; Nabumetone (as described *supra*, at n.5); and certain other medications of less relevance here.[11]  (*See id*. at 363.)

A few days later, on December 28, 2010, in connection with Plaintiff's application for SSI, Dr. Ghumman filled out a questionnaire, in which he stated that Plaintiff had been under his care since August 10, 2010.  (*Id*. at 371.)  Dr. Ghumman noted that he had seen Plaintiff on December 4, 2010,[12] although her most recent visit had been on December 28, 2010, the day he completed the form.  (*Id*.)  Dr. Ghumman stated that Plaintiff had been "compliant with her treatment," and recorded that her medication included Risperdal (*see supra* n.8), Seroquel (*see supra* n.9), Zoloft (*see supra* n.10), and Restoril (*see supra* n.7).  (R. at 371.)

---

[8] Risperidone, commonly known by the brand name Risperdal, "is used to treat schizophrenia, bipolar disorder, or irritability associated with autistic disorder." http://www.mayoclinic.org/drugs-supplements/risperidone-oral-route/description/drg-20067189 (last visited on Jan. 23, 2015).

[9] Seroquel is the brand name for Quetiapine, a medication used to treat the symptoms of schizophrenia as well as episodes of mania or depression in patients with bipolar disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698019.html#why (last visited on Jan. 23, 2015).

[10] Sertraline, commonly known by the brand name Zoloft, is a type of antidepressant called a selective serotonin reuptake inhibitor (SSRI) used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html (last visited on Jan. 23, 2015).

[11] These additional medications included Diphenhydramine (an antihistamine), *see* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682539.html#why (last visited on Jan. 23, 2015), and Simvastatin (a cholesterol medication), *see* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692030.html (last visited on Jan. 23, 2015).

[12] No medical records from this visit appear to be in the Record.

Dr. Ghumman reported that Plaintiff suffered from "depression, mood swings, psychosis (hearing voices [and] feeling paranoid), sleep disturbances, and difficulty . . . focus[ing] and concentrat[ing]." (*Id.*) He stated that Plaintiff was "relatively clinically stable on treatment, but [did] have emotional and behavioral exacerbations on and off, affecting her baseline routine life." (*Id.*) He reported that she still "experience[d] depression [and] anxiety" and that she still "hear[d] voices," although less in severity and frequency. (*Id.*) He also noted that she was "still paranoid" and found it "difficult[] to focus." (*Id.*)

Using the multiaxial method of assessment,[13] Dr. Ghumman diagnosed Plaintiff with "major depression with psychotic features" on Axis I, with a need to rule out "schizoaffective disorder" (*id.* at 372), and, for Axis II, he similarly indicated the need to rule out "schizoaffective personality" disorder (*id.*). For Axis III, he recorded an "enlarged thyroid" and "arthritis." (*Id.*) As to Axis IV, Dr. Ghumman noted "chronic mental illness, disturbed childhood, [and] no children." (*Id.*) Finally, for Axis V, Dr. Ghumman recorded a GAF of 55.[14] (*Id.*)

Dr. Ghumman's prognosis was that Plaintiff suffered from "chronic mental illness" and seemed to be in need of "long-term Psychiatric Treatment." (*Id.*) Also, Dr. Ghumman circled "Yes" in response to the question "Ha[ve] the patient's impairments lasted or can [they] be expect[ed] to last at least twelve months?" (*Id.*)

---

[13] The multiaxial system of assessment "involves an assessment on several axes, each of which refers to a different domain of information." DSM-IV at 27. Axis I refers to clinical disorders and other conditions that may be the focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions that may be relevant to the understanding or management of the individual's mental disorder; Axis IV refers to psychosocial and environmental problems that may affect the diagnosis, treatment, and prognosis of mental disorders; and Axis V refers to GAF. *Id.*

[14] A GAF score in the 51-60 range signifies "moderate symptoms or moderate difficulty in social, occupational, or school situations." *Petrie v. Astrue*, 412 F. App'x 401, 506 n.2 (2d Cir. 2011) (citing DSM-IV at 376-77).

On May 14, 2010, Dr. Ghumman completed a "Medical Assessment of [Plaintiff's] Ability To Do Work-Related Activities (Mental)." (*Id.* at 373-75.)  As to limitations in making an occupational adjustment, Dr. Ghumman stated that Plaintiff suffered from "mood swings . . . hallucinations, depression, [and] difficulty focusing," which "affect[ed] her baseline functional level." (*Id.* at 374.)  As to limitations in making a performance adjustment, Dr. Ghumman similarly noted that Plaintiff suffered from "paranoia, mood swings, anger issues, hallucinations, sleep[] difficulty, [and] difficulty focusing and concentrating," which the doctor again found to "affect her baseline functional level." (*Id.*)  Dr. Ghumman indicated that any stress, work-related or not, could "deteriorate [Plaintiff's] clinical condition" and that Plaintiff "seem[ed] to suffer from chronic mental illness." (*Id.* at 375.)

Dr. Ghumman did not, however, fill out the portion of the form regarding Plaintiff's limitations as to ability to transition into a new job, make a performance adjustment, or make personal/social adjustments, as he considered those topics "beyond [the] scope of [his] assessment." (*Id.* at 373-74.)  Dr. Ghumman also declined to give an opinion where the form asked for a description of any limitations Plaintiff had as to personal-social adjustment. (*Id.* at 374.)  As to the medications Plaintiff was taking as of May 14, 2011, Dr. Ghumman listed Risperdal (*see supra* n.8), Seroquel (*see supra* n.9), Zoloft (*see supra* n.10), and Wellbutrin.[15] (R. at 375.)

---

[15] Wellbutrin is a brand name of Bupropion, a medication used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695033.html (last visited Jan. 23, 2015).

2.      **Consultant Reports**

a.      **Psychiatric Consultative Examination
(June 1, 2010, by Dr. Joyce Schreiber)**

In connection with her application for SSI, Plaintiff underwent a psychiatric examination
on June 1, 2010, by a consultant, Dr. Joyce Schreiber.  Dr. Schreiber noted that Plaintiff had
traveled approximately 12 miles by herself, via public transportation, to the appointment.  (*Id.*
at 304.)  Plaintiff reported that she was unemployed at the time, had last worked in April of
2008,[16] and that she had stopped working due to "psychiatric problems."  (*Id.*)  Plaintiff stated
that she had previously been hospitalized for psychiatric reasons three times.  (*Id.*)  Plaintiff also
acknowledged a history of substance abuse, but stated that she had been sober for five years and
attended treatment sessions at the Martin Luther King Jr. Health Center.  (*Id.* at 304-05.)

According to Dr. Schreiber, Plaintiff reported a range of psychiatric symptoms associated
with depression and mania, including, *inter alia*, hopelessness, loss of interests, recurrent
thoughts of death or suicide with no suicidal intent, flight of ideas, problems with concentration,
distractibility and psychomotor agitation.  (*Id.* at 305.)  Plaintiff also stated that she heard voices,
which told her "negative things" and made her "angry."  (*Id.*)  Dr. Schreiber noted that Plaintiff
was appropriately dressed and spoke fluently, and that her thought processes were "coherent and
goal-directed."  (*Id.* at 305-06.)  Dr. Schreiber also reported, though, that Plaintiff appeared
depressed and sad.  (*Id.* at 306.)

Dr. Schreiber noted that Plaintiff's "attention and concentration [were] intact," as she was
"able to count forward and backwards" and "could do simple calculations and serial 3's."  (*Id.*)
She also reported that Plaintiff's "recent and remote memory skills were fair" and that Plaintiff

---

[16] This timeline of Plaintiff's employment is inconsistent with statements on her disability
report (R. 186-94) that she last worked in April of 2009.

"appear[ed] [to be] of borderline intellectual functioning," with "a slightly limited general fund of information." (*Id.*)  With regard to her mode of living, Plaintiff reported to Dr. Schreiber that she was able to dress, bathe, and groom herself, as well as to do some laundry, cleaning and shopping.[17] (*Id.*)  Dr. Schreiber concluded that, vocationally, Plaintiff appeared capable "of following, understanding, and remembering simple instructions and directions," and of performing simple tasks and maintaining a schedule. (*Id.* at 307.)  Dr. Schreiber also noted, however, that Plaintiff had a history of difficulties in making appropriate decisions, dealing with stress, and being able to interact appropriately with others. (*Id.*)  Dr. Schreiber found that the results of her examination "appear[ed] to be consistent with psychiatric problems . . . [which] may significantly interfere with [Plaintiff's] ability to function on a daily basis." (*Id.*)

Using the multiaxial method of assessment (*see supra* at n.13), Dr. Schreiber diagnosed Plaintiff, on Axis I, with "Schizoaffective Disorder," "Bipolar Disorder NOS" (Not Otherwise Specified), and "Polysubstance Dependence in full sustained remission." (*Id.*)  On Axis II, she diagnosed Plaintiff with "Personality Disorder with Borderline Features" and, on Axis III, with "recurrent muscle/joint pain." (*Id.*)  Dr. Schreiber recommended that Plaintiff "continue with psychological, psychiatric, and substance abuse treatment" and undergo a medical evaluation to reveal the cause of her physical symptoms. (*Id.*)  Dr. Schreiber gave Plaintiff a "cautious to guarded" prognosis and stressed the importance of "continued intervention and support." (*Id.*)

### b.   Internal Medicine Consultative Examination (June 30, 2010, by Dr. Sharon Revan)

On June 30, 2010, a consulting internist, Dr. Sharon Revan, conducted an internal medicine examination of Plaintiff, in connection with her application for SSI. (*See id.* at 321.)

---

[17] Part of this statement is inconsistent with Plaintiff's testimony at the administrative hearing that she was sometimes unable to bathe. (R. at 39.)

At that examination, Plaintiff reported a history of psychiatric issues, including bipolar disease, anxiety, paranoia, schizophrenia, depression, and hearing voices, and she told Dr. Revan that she had been evaluated by a psychologist several weeks earlier.  (*Id.* at 321.)  According to Dr. Revan, Plaintiff also complained of hypothyroidism, hand pain, eye pain, bronchitis, and shortness of breath upon walking three blocks or climbing steps.  (*Id.*)  Dr. Revan listed the medications that Plaintiff was taking, including, *inter alia*, Ambien,[18] Seroquel (*see supra* n.9), Zoloft (*see supra* n.10), Simvastatin (*see supra* n.11), and Nabumetone (*see supra* n.5). (R. at 322.)[19]  Plaintiff also reported a history of drug abuse.  (*Id.*)  Plaintiff stated that she showered, dressed, and cooked for herself, that she was able to do some cleaning and laundry, and that she watched television and followed up with her doctor, but that her hands hurt and the pain sometimes caused her to drop things.  (*Id.*)

Dr. Revan diagnosed Plaintiff with the following:  hypothyroidism, eye problems, hand problems, muscle twitching, bronchitis, bipolar disease, anxiety, paranoia, schizophrenia, hearing voices and hallucinating, and depression.  (*Id.* at 324.)  She gave Plaintiff a "fair" prognosis. (*Id.*)  Dr. Revan also stated that, in her opinion, Plaintiff had mild limitations with gross motor activity in the upper extremities due to pain; mild limitations walking distances, climbing stairs and lying down due to shortness of breath; and mild limitations in daily living activities due to hand pain.  (*Id.*)

---

[18] Ambien is the brand name for Zolpidem, a mediation used to treat insomnia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693025.html (last visited Jan. 23, 2015).

[19] Dr. Revan also noted that Plaintiff was taking Ventolin (the brand name for Albuterol Oral Inhaler), which is used to prevent and treat wheezing, shortness of breath, coughing, and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682145.html (last visited Jan. 23, 2015.)

### c.    Mental RFC Assessment
### (July 16, 2010, by Psychologist V. Reddy)

Dr. V. Reddy, apparently a consulting psychologist,[20] completed a Mental Residual

Functional Capacity ("RFC") Assessment of Plaintiff on July 16, 2010, and found that Plaintiff

was "Moderately Limited" in the following categories: "ability to understand and remember

detailed instructions," "ability to carry out detailed instructions," "ability to maintain attention

and concentration for extended periods," and "ability to complete a normal workday without

interruptions from psychologically based symptoms and to perform at a consistent pace." (*Id*.

at 309-10.) Dr. Reddy found Plaintiff was "Not Significantly Limited" in each of the remaining

categories considered. (*See id.* at 309-10.) Dr. Reddy specifically noted that the "treating source

did not provide a work related statement"[21] and concluded that Plaintiff appeared "capable of the

basic functional requirements of unskilled work in a low stress environment." (*Id.* at 311.) On

the same date, Dr. Reddy filled out a "Psychiatric Review Technique" Form and opined that

Plaintiff did not meet or medically equal the listings for Schizophrenic, Paranoid and other

Psychotic Disorders (12.03), or Affective Disorders (12.04). (*See id*. at 344-45.) Dr. Reddy

found that Plaintiff had only "mild" limitations in her activities of daily living and social

---

[20] The record contains no indication of V. Reddy's full name or qualifications. Although Plaintiff suggests that this examiner did not actually possess the necessary medical qualifications to perform an assessment (*see* Plaintiff's Memorandum of Law in Support of Motion for Judgment on the Pleadings, dated Mar. 17, 2014 (Dkt. 12), at 5), Defendant points out that the "Disability Determination and Transmittal Form" refers to this examiner as having a Ph.D. (*See* Memorandum of Law in Support of Defendant's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, dated May 23, 2014 (Dkt. 16), at 18 (citing to R. at 62).) Additionally, the ALJ referred to Dr. Reddy as a "clinical psychologist for the State Agency." (R. at 23.)

[21] It appears that Dr. Ghumman provided a work-related statement later, on May 14, 2011. (*See* R. at 371-75.)

functioning (*id*. at 344), that she had "moderate limitations" in maintaining concentration, persistence or pace (*id*.), and that she had experienced "one or two" episodes of decompensation (*id*.).

### B.   Plaintiff's Statements Regarding Her Claimed Impairments, Made in Connection with Her Application for Benefits_____

At or about the time that she filed her application for SSI, Plaintiff provided certain reports to the Social Security Administration, in which she described her claimed impairments and provided other information relevant to her claims.

### 1.   Disability Report

On April 28, 2010, the day she filed her application, Plaintiff completed a form "Disability Report" (*see id*. at 186-94), in which she reported that she was "bipolar with psychotic features," that she had PTSD (post-traumatic stress disorder), and she had cocaine and alcohol dependence issues.  (*Id*. at 187.)  Plaintiff also stated that she had stopped working in April of 2009, when she was "fired due to detoxing on methadone and [because] [she] was hearing voices."  (*Id*. at 188.)

Plaintiff further reported that her highest grade of education was the 10th grade.  (*Id*.) She stated that, in her past work, she had been a home health aide for an elderly client, a job she maintained from 2007 through 2009.  (*Id*. at 189.)  Plaintiff also reported that she could "handle large objects," that she could "write, type or handle small objects" for up to one hour, and that she could "reach" for up to two hours.  (*Id*. at 190.)  Plaintiff recorded that she was taking Seroquel (*see supra* n.9) and Zoloft (*see supra* n.10).  (R. at 190.)

### 2.   Work History and Function Reports

Also in connection with her SSI application, Plaintiff filled out, on June 1, 2010, both a form "Work History Report" (*id*. at 195-98) and a form "Function Report" (*id.* at 200-11).

In terms of her work history, Plaintiff noted that, although she did not remember any specific dates (*see id*. at 198), she had previously worked as a home health aide, as well as in park and recreation maintenance, as a messenger, in a factory, and in a clerical position (*id*. at 195-96).

As to her current ability to function, Plaintiff reported that she lived alone in an apartment and that her normal day consisted of "shower[ing], dress[ing] [and attending] program." (*Id*. at 200-01.) Plaintiff further reported that, because of her impairments, she was no longer able to "read, concentrate, be around multiple . . . people, . . . [or] listen to music." (*Id*. at 201.) She also indicated that her impairments affected her sleep (*id*.), and that, while she did not have problems with personal care, she needed reminders to take care of her personal needs and to take medicine (*id*. at 201-02). Plaintiff indicated that she prepared her own meals and that she could do household cleaning and laundry without assistance. (*See id*. at 202-03.) She stated, though, that she only went out to go to her "program" and that she sometimes felt paranoia when she when out. (*Id*. at 203.) Plaintiff reported that she watched television and called her mother once per week, but that she did not participate in any social activities. (*Id*. at 204-05.) Plaintiff checked "yes" in response to a question asking whether she had "any problems getting along with family, friends, neighbors, or others." (*Id*. at 205.)

Plaintiff additionally reported hearing voices (*id*. at 205) and problems paying attention (*id*. at 206), and she checked both "yes" and "no" for the questions "can you finish what you start" and "have you any problems getting along with  . . . people in authority" (*id*.). She reported that she had lost a job because of not getting along with people, and that she had trouble remembering things. (*Id*. at 207.)

As to her physical impairments, Plaintiff indicated on the form that she could only walk a block or two before she had to rest for five to 10 minutes. (*Id.* at 206.) She also reported that she had first felt pain in July of 2009, in her hands and sometimes her feet. (*Id*. at 208.) She noted that X-rays had been taken, and she described the pain as "tingling." (*Id*.) She also reported that she took medication for this pain, and that the medication relieved the pain for a "short time." (*Id*. at 209.)

### C. Procedural History

#### 1. Plaintiff's SSI Application

On April 28, 2010, Plaintiff filed an application for SSI, alleging disability as of that same day. (*Id.* at 161-67.) The claim was denied on July 19, 2010 (*id*. at 63-68), and, on August 2, 2010, Plaintiff filed a request for a hearing (*id.* at 69-71). Plaintiff appeared for the hearing on December 8, 2010 (*id*. at 56), but it was adjourned so that Plaintiff could obtain legal representation (*id.* at 58-61). A second hearing date was scheduled for May 18, 2011. (*Id*. at 33.)

#### 2. Administrative Hearing And Decision

On May 18, 2011, Plaintiff, represented by attorney Daniel Berger, appeared and testified before the ALJ. Plaintiff testified that she was unable to work for a variety of reasons, including that she heard voices and suffered from arthritis in her hands. (*See id.* at 36, 41.)

Plaintiff testified that she began hearing voices about two years prior to the hearing, while attempting to detox from methadone. (*Id.* at 39-40.) She stated that she participated in a mental health program and had not used any illegal substances since 2009. (*Id.* at 40.) Plaintiff testified that that she could not work because she was scared she "might hurt somebody" or hurt herself. (*Id*. at 37; *see also id*. at 44.) As an example, she stated that, sometime in 2010, she had

turned on the gas in her apartment and burned her arms; when asked by the ALJ why she did

this, her response was "the voices." (*Id.* at 38; *see also id.* at 45.) Plaintiff reported hearing

voices during the hearing itself and stated that the voices did not want her to be there and were

trying to make her leave. (*Id.* at 38-39.) Plaintiff testified that, sometime in 2009, she had

checked herself into a psychiatric unit because of the voices. (*Id.* at 39.) She also stated that, at

the time of the hearing, she had been under the care of a psychiatrist, Dr. Ghumman, for almost a

year. (*Id.* at 41.)

Plaintiff also testified to certain physical ailments. She described experiencing back pain

and difficulty walking. (*Id.* at 41.) She also stated that her bones bothered her and that she had

arthritis in her hands. (*Id.*) Finally, she testified that she needed help with certain daily chores

and activities, such as preparing meals, doing laundry, lifting or opening anything, mopping,

cleaning, and food shopping, because her hands sometimes went numb and "g[a]ve out" on her.

(*See id.* at 41, 44.)

Plaintiff stated that, at the time of the hearing, she was living alone in a studio apartment

in the Bronx, receiving public assistance in the amount of $200.00 per month and paying rent

with her unemployment benefits. (*See id.* at 36, 41.) Plaintiff also stated that she did not like to

go out and that she had lost interest in many things she used to enjoy, such as reading and

watching movies. (*See id.* at 42-43.) Plaintiff testified that she had trouble focusing while

watching television because of the voices in her head. (*Id.* at 45.) She also reported trouble

sleeping, remembering to take her medication, and bathing on some days. (*Id.* at 44-45.)

With regard to her previous employment, Plaintiff testified that she was terminated from

her most recent job as a home health aide because her employer received complaints about "what

[she] was doing in people['s] houses." (*Id.* at 43.) When asked if the complaints were based on

Plaintiff's failure to perform her duties, she replied "yes." (*Id.* at 44.) According to Plaintiff, because she was hearing voices, she did not do "what [she] was supposed to be doing inside people['s] homes. (*Id.* at 43.) She said she did not realize that she had been doing her job incorrectly, and did not believe that she could do it correctly at the time of the hearing, largely out of fear that she might hurt somebody. (*Id.*) As for future employment prospects, Plaintiff stated that she was working with her psychiatrist and could possibly return to work at a later date, but that she was scared and not fit to work at that time. (*Id.*)

A vocational expert, David Sypher (the "VE"), also appeared telephonically and testified. (*See id.* at 46-51.) The VE testified that Plaintiff's previous work as a "home attendant" would no longer be suitable for her. (*Id.* at 46-47.) He also testified, however, that Plaintiff would be capable of performing certain sedentary, unskilled jobs. (*See id.* at 47.) He listed two in particular: electrical assembler and final assembler. (*Id.*) He further testified that that there was a national employment of 38,689 electrical assemblers, with 1,974 in the state of New York and 211 in the five boroughs of New York City. (*Id.*) As for final assembler jobs, he testified that there were 28,554 in the national economy, 1,256 in the state of New York, and 783 in New York City. (*Id.*)

On June 24, 2011, the ALJ issued a decision finding that Plaintiff was not entitled to benefits, because she was not disabled under the Act. (*See generally id.* at 14-26.) The ALJ's decision is discussed in detail below. (*See infra*, at Discussion Section II.)

### 3.   Plaintiff's Request for Review by the Appeals Council

On July 12, 2011, Plaintiff requested that the Appeals Council review the ALJ's decision. (*Id.* at 31-32.) Seven months later, in further support of this request, Plaintiff, though counsel, submitted a letter to the Appeals Council, laying out detailed factual and legal arguments as to

why reversal of the ALJ's decision or, alternatively, remand was required.  (*See id.* at 4-5; *see also id.* at 229-33 (Letter from Daniel Berger, Esq. to Appeals Council, dated Feb. 12, 2010).)

On January 30, 2013, the Appeals Council denied Plaintiff's request for review. (*Id.* at 1-6.)  The notice of denial of review stated, without explanation, that the Appeals Council had "considered the reasons [Plaintiff] disagree[d] with the decision and the additional evidence" that she had submitted, but that it "found no reason . . . to review the [ALJ's] decision."  (*Id.* at 1.)[22] The ALJ's decision thus became the final decision of the Commissioner.

### 4.    The Motions Before This Court

On February 25, 2013, Plaintiff filed the Complaint in this action, seeking review of the Commissioner's decision.  (*See generally* Complaint, dated Feb. 25, 2013 (Dkt. 2).)  Defendant answered the Complaint on July 15, 2013.  (*See generally* Answer, dated Jul. 15, 2013 (Dkt. 8).)

Currently pending before this Court are Plaintiff's motion and Defendant's cross-motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Plaintiff argues that the Commissioner's decision should be reversed or remanded because the ALJ and the Appeals Council failed to accord controlling weight to the opinion of Plaintiff's treating psychiatrist.  (*See generally* Plaintiff's Memorandum of Law in Support of Motion for Judgment on the Pleadings, dated Mar. 17, 2014 ("Pl. Mem.") (Dkt. 13).)  Defendant argues that the final decision of the Commissioner must be upheld because the ALJ applied the correct legal standards and his decision was supported by substantial evidence.  (*See generally* Memorandum of Law in Support of Defendant's Cross-Motion for Judgment on the Pleadings and in

---

[22] The Record does not reflect that Plaintiff actually submitted any "additional evidence" to the Appeals Council, subsequent to the ALJ's ruling.

Opposition to Plaintiff's Motion for Judgment on the Pleadings, dated May 23, 2014

("Def. Mem.") (Dkt. 17).)

**DISCUSSION**

## I.   APPLICABLE LEGAL STANDARDS

### A.   Standard of Review

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes 'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by considering the contents of the pleadings,'" *id*. (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of the Commissioner's decision is limited.  The Commissioner's decision is final, provided that the correct legal standards are applied and findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g) (2006); *Shaw v. Carter*, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).  "Where an error of law has been made that might have affected the disposition of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted).  Thus, the first step is to ensure that the Commissioner applied the correct legal standards. *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The next step is to determine whether the Commissioner's decision is supported by substantial evidence.  *See Tejada*, 167 F.3d at 773.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v.*

20

*Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted).  In making

this determination, a court must consider the underlying record.  The reviewing court does not,

however, decide *de novo* whether a claimant is disabled.  *See Veino v. Barnhart,* 312 F.3d

578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings

supported by evidence having rational probative force, we will not substitute our judgment for

that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v.*

*Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997).  Therefore, if the correct legal principles have been

applied, this Court must uphold the Commissioner's decision upon a finding of substantial

evidence, even where contrary evidence exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126

(2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination

is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83

(2d Cir. 1998) (affirming decision where substantial evidence supported both sides).

### B.       The Five-Step Sequential Evaluation

To be entitled to disability benefits under the Act, a plaintiff must establish his or her

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§ 423(d)(1)(A); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  An individual is considered

to be under a disability only if the individual's physical or mental impairments are of such

severity that he or she is not only unable to do his or her previous work, but also cannot,

considering his or her age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits.  *See* 20 C.F.R. § 416.920; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam).  Throughout the inquiry, the ALJ must consider four primary sources of evidence:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citations omitted).

The first step of the inquiry requires the ALJ to determine whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 416.920(a)(4)(i).  If not, at the second step, the ALJ determines whether the claimant has a "severe" impairment or combination of impairments that significantly limit his or her physical or mental ability to do basic work activities.  *Id.* §§ 416.920(a)(4)(ii), (c).  If the claimant does suffer from such an impairment, then the third step requires the ALJ to determine whether this impairment meets or equals an impairment listed 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").  *Id.* § 416.920(a)(4)(iii).  If it does, then the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience."  *Id.*

Where the plaintiff claims mental impairment, steps two and three require the ALJ to apply a "special technique," outlined in 20 C.F.R. § 416.920a to determine the severity of the claimant's impairment at step two, and to determine whether the impairment satisfies Social Security regulations at step three.  *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).  If the claimant is found to have a "medically determinable mental impairment," the ALJ is required to

22

"specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s)" and then to "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of [section 416.920a]," which specifies four broad functional areas:  (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation."[23]  20 C.F.R. §§ 416.920a(b)(2), (c)(3); *see Kohler*, 546 F.3d at 265.  The functional limitations for these first three areas are rated on a five-point scale of "[n]one, mild, moderate, marked, [or] extreme," and the limitation in the fourth area (episodes of decompensation) is rated on a four-point scale of "[n]one," "one or two," "three," or "four or more."  20 C.F.R. § 416.920a(c)(4).

If the claimant's impairment does not meet or equal a listed impairment, then the ALJ must determine, based on all the relevant evidence in the record, the claimant's RFC, or residual functional capacity to perform physical and mental work activities on a sustained basis.  *Id.* § 416.945.  The ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether the claimant's RFC allows the claimant to perform his or her "past relevant work."  *Id.* § 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform his or her past relevant work, then the fifth step requires the ALJ to determine whether, in light the claimant's RFC, age, education, and work experience, the claimant is capable of performing "any other work" that exists in the national economy.  *Id.* §§ 416.920(a)(4)(v), (g).

---

[23] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Morales v. Colvin*, No. 13cv4302 (SAS), 2014 WL 7336893, at *8 (S.D.N.Y. Dec. 24, 2014) (quoting *Kohler v. Astrue*, 546 F.3d 260, 266 n.5 (2d Cir. 2008)).

On the first four steps of the five-step evaluation, the claimant generally bears the burden of establishing facts to support his or her claim. *See Berry*, 675 F.2d at 467 (internal citation omitted). At the fifth step, the burden shifts to the Commissioner to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984). The Commissioner must establish that the alternative work "exists in significant numbers" in the national economy and that the claimant can perform this work, given her RFC and vocational factors. 20 C.F.R. § 416.960(c)(2).

Where the claimant suffers only from exertional impairments, the Commissioner may satisfy this burden by referring to the Medical-Vocational Guidelines set out in 20 C.F.R. Pt. 404, Subpt. P, App. 2 (2008). Where, however, the claimant suffers non-exertional impairments (such as psychiatric impairments), *see* 20 C.F.R. § 416.929a(c), that "'significantly limit the range of work permitted by his [or her] exertional limitations,' the ALJ is required to consult with a vocational expert," rather than relying exclusively on the published guidelines. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986) (internal citations omitted)). To be reliable, the vocational expert's assessment of a claimant's ability to work must incorporate the full extent of the claimant's limitations and capabilities. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981); *see also Lugo v. Chater*, 932 F. Supp. 497, 504 (S.D.N.Y. 1996). Assuming the claimant's limitations are fully incorporated into the vocational expert's analysis, the Commissioner may rely on the vocational expert's testimony to demonstrate that a sufficient number of jobs exist in the national economy which the claimant is capable of performing. *See Bapp*, 802 F.2d at 605-06; *see also Perez v. Colvin*, No. 12cv5317, 2013 WL 5350566, at *7 (E.D.N.Y Sept. 23, 2013) ("It is

standard practice for the Commissioner to use vocational expert testimony to satisfy his burden

of showing that there exist jobs that the claimant is capable of performing, and the ALJ may rely

on the testimony of such an expert, including responses to hypotheticals.")

### C.   Duty to Develop Record

Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ

generally has an affirmative duty to develop the administrative record, *Perez v. Chater*,

77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d

751, 755 (2d Cir. 1982)), and failure to develop the record may be grounds for remand, *Snell* v.

*Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).  The SSA regulations describe this duty as:  "[b]efore

we make a determination that you are not disabled, we will develop your complete medical

history . . . [and] will make every reasonable effort to help you get medical reports from your

own medical sources when you give us permission to request the reports."  20 C.F.R.

§ 416.912(d).  "Every reasonable effort" is, in turn, defined to mean that the SSA "will make an

initial request for evidence from your medical source and, at any time between 10 and 20

calendar days after the initial request, if the evidence has not been received, we will make one

follow up request to obtain the medical evidence necessary to make a determination."  *Id*.

§ 416.912(d)(1).  The regulations further explain that "[b]y 'complete medical history,' we [the

SSA] mean the records of your medical source(s)."  *Id*. § 416.912(d)(2).

Additionally, if the information obtained from the medical sources is insufficient to make

a disability determination, or if the Commissioner is unable to seek clarification from treating

sources, the regulations provide that the Commissioner should ask the claimant to attend one or

more consultative evaluations.  20 C.F.R. §§ 416.912(e), 416.917.  Finally, "[i]f an ALJ

perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to

seek out more information from the treating physician and to develop the administrative record accordingly." *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) (citing *Clark v. Commissioner of Social Sec.,* 143 F.3d 115, 118 (2d Cir.1998)).

### D.   The Treating Physician Rule

The medical opinion of a treating source[24] as to "the nature and severity of [the claimant's] impairments" is entitled to "controlling weight," where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). Treating physicians' opinions are generally accorded deference because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's condition and "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. § 416.927(c); *see Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004).

Where the ALJ decides to give less than controlling weight to a treating physician's opinion, and also in determining the weight to be accorded to the medical opinion of a non-treating physician, the ALJ is required to consider a number of factors. These include: (1) the length, nature, and extent of the relationship between the claimant and the physician; (2) the supportability of the physician's opinion; (3) the consistency of the physician's opinion with the

---

[24] "[T]reating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source who . . . has provided [the claimant] with medical treatment or evaluation" and who has had "an ongoing treatment relationship" with him or her. 20 C.F.R. § 416.902. A medical source who has treated or evaluated the claimant "only a few times" may be considered a treating source "if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)." *Id.*

record as a whole; and (4) the specialization of the physician providing the opinion.  20 C.F.R.

§§ 416.927(c)(2)-(5); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (noting that

these factors "must be considered when the treating physician's opinion is not given controlling

weight").

 An ALJ must "give good reasons" for the weight accorded to a treating source's opinion.

20 C.F.R. § 416.927(c)(2).  Failure to "give good reasons" is grounds for remand.  *Halloran v.

Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the

Commissioner has not provided 'good reasons' for the weight given to a treating physician's

opinion . . . .").  In addition, a consultative physician's opinions should generally be given "little

weight."  *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009) (internal quotation marks and

citation omitted).  This is because consultative examinations "are often brief, are generally

performed without benefit or review of [the] claimant's medical history, and, at best, only give a

glimpse of the claimant on a single day."  *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)

(internal quotation and citation omitted).)

## II. THE ALJ'S DECISION

 In the instant case, after reviewing the evidence under the five-step procedure, the ALJ

concluded that Plaintiff was not disabled.  (*See generally* R. at 14-30.)

### A. Step One

 At step one of the inquiry, the ALJ found that Plaintiff had not engaged in substantial

gainful activity since April 28, 2010, the date of Plaintiff's application.  (*Id*. at 19.)

### B. Step Two

 At step two of the analysis, the ALJ found that Plaintiff had two severe impairments:

(1) hand pain with numbness, and (2) major depressive disorder with psychotic features.  (*Id.*)

The ALJ found that such impairments imposed "more than minimal functional limitations on [Plaintiff's] ability to perform basic work-related activities." (*Id.*)

### C.   **Step Three**

Next, at step three, the ALJ concluded that none of Plaintiff's conditions met or medically equaled any impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (*Id.*)

First, the ALJ found that Plaintiff's hand impairment did not meet or medically equal the listings for musculoskeletal and neurological impairments (*i.e.*, listings 1.00 and 11.00) because "there [were] no objective findings to support [Plaintiff's] allegations of severe hands pain." (*Id.*)

Second, the ALJ concluded that Plaintiff's psychological impairments did not meet or equal the listing for affective disorders (*i.e.*, Listing 12.04).[25]  As part of that finding, the ALJ

---

[25] A claimant meets the listing for affective disorders where he or she meets both the "paragraph A" and "paragraph B" criteria, or meets the "paragraph C" criteria.

To meet the "paragraph A" criteria, a claimant would need to demonstrate "medically documented persistence," of either "depressive syndrome" (characterized by at least four of nine listed symptoms including, for example, sleep disturbance, decreased energy, thoughts of suicide, and hallucinations), "manic syndrome" (characterized by at least three of eight listed symptoms, including, for example, hyperactivity, flight of ideas, and easy distractibility), or "bipolar syndrome" (manifested by the "full symptomatic picture" of both manic and depressive syndromes).

To meet the "paragraph B" criteria, a claimant would need to demonstrate at least two of the following:  (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration.

To meet the "paragraph C" criteria, a claimant would need to demonstrate (1) a medically documented history of chronic affective disorder of at least two years' duration causing more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and (2) one of the following:  (a) repeated episodes of decompensation, each of extended duration; or (b) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or a change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

determined that Plaintiff's impairment did not satisfy the paragraph B criteria (*see* n.25, *supra*), in part because he found her to have only "moderate restriction[s]" with activities of daily living (R. at 20 (noting that Plaintiff took care of her own personal hygiene, performed "some cleaning, cooking, laundry, and shopping," attended her treatment program, watched television, and performed some chores)).  In support of this finding, the ALJ cited to the Function Report that Plaintiff filled out in connection with her application for SSI and the consultative examinations of Dr. Schreiber and Dr. Revan.  (*See id*.)  He also found that Plaintiff had only "moderate difficulties" with social functioning as, even though she lived alone, Plaintiff had regular visits from her fiancé.  (*Id*.)  On a related point, the ALJ concluded that Plaintiff "ha[d] no documented pattern of maladaptive behavior and related well with her fiancé."  (*Id*.)  The ALJ further found that Plaintiff had only moderate difficulties with concentration, persistence and pace, even though Dr. Schreiber reported that Plaintiff exhibited "fair recent and remote memory" and "borderline intellectual functioning," as Dr. Schreiber also found that Plaintiff was "oriented in all spheres with intact attention and concentration."  (*Id*.)  The ALJ also noted that Plaintiff had been able to travel alone via public transportation to the appointment with Dr. Schreiber.  (*Id.*) Finally, as to the paragraph B criteria, the ALJ found that Plaintiff had not experienced any "episodes of decompensation of an extended duration," noting that, since the alleged onset date, Plaintiff had not been hospitalized as a result of her depressive disorder.  (*Id.*)

The ALJ next determined that "the evidence fail[ed] to establish the presence of 'paragraph C' criteria."  (*Id*.; *see* n.25, *supra*.)  The ALJ did not, however, reference any evidence to support this finding; instead he merely went through the associated factors and stated that they were not present here.  (*Id*.)

D.     **RFC Analysis, and Step Four**

Before proceeding to Step Four, the ALJ made a determination of Plaintiff's RFC, finding:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) with maximum of frequent use of hands, from the physical standpoint.  [Plaintiff] can perform simple repetitive tasks, with no contact with the public and occasional contact with supervisors and co-workers, from the mental standpoint.

(*Id.* at 21.)  The ALJ stated that, in making this RFC finding, he had considered all of Plaintiff's symptoms, as well as the extent to which those symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence."  (*Id.*)  Further, the ALJ stated that, in considering Plaintiff's symptoms, he had followed the necessary "two-step process" of, first, determining whether Plaintiff had any "underlying medically determinable physical or mental impairment[] . . . that could cause reasonably be expected to produce [her] pain or other symptoms," and, if so, then proceeding to evaluate Plaintiff's symptoms to determine the "extent to which they limit[ed] [her] functioning."  (*Id.*)  The ALJ noted that, "[f]or this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms [were] not substantiated by objective medical evidence," he was required to "make a finding on the credibility of the statements based on a consideration of the entire case record."  (*Id.*)

In explaining his RFC finding, the ALJ began by noting Plaintiff's own reported symptoms, acknowledging that Plaintiff alleged "hand pain and numbness," "sleep disturbances, sadness, tension, and crying spells that interfere[d] with her concentration and with her ability to work."  (*Id.*)  The ALJ found that Plaintiff's medical impairments "could reasonably be expected to cause the alleged symptoms," but also found that Plaintiff's statements regarding the

30

"intensity, persistence and limiting effects of these symptoms [were] not credible to the extent

they [were] inconsistent with the . . . residual functional capacity assessment." (*Id.*)

 The ALJ then went on to catalog a fair amount of the medical evidence in the record,

referencing (although not immediately discussing), each of the following:

- Plaintiff's January 13, 2009 physical examination, upon which she "only
  received [a] diagnosis of alopecia areata" (*see* n.1, *supra*), and her March 23,
  2010 hospital visit, upon which she received a diagnosis of "paresthesia," in
  both hands, but reflected "no sensory or motor deficits," normal deep tendon
  reflexes, and "full range of motion in all of her joints" (*id*. at 21.)

- Plaintiff's April 21, 2010 follow-up examination by Dr. Morris, when Plaintiff
  complained of numbness and tingling in her hands, but Dr. Morris reported,
  after tests, that she was doing better with Nabumetone, indicating that her
  hand discomfort was due to inflammation (*id*. at 22); and Plaintiff's report, on
  June 7, 2010, that the medication was helping to ease the pain in her hands
  and did not result in side effects (*id*.).

- The June 30, 2010 consultative, internal medicine examination by Dr. Revan,
  upon which Dr. Revan recorded Plaintiff's complaints of eye problems,
  hypothyroidism, bronchitis, shortness of breath, hand pain, and muscle
  movements (*id*. at 22); made observations that, *inter alia*, Plaintiff did not
  appear to be in acute distress, did not use an assistive device, and was able to
  rise from a chair without difficulty (*id*.); and found that Plaintiff "had mild
  limitations for gross motor activity due to pain, mild limitations for walking
  distances, climbing stairs and lying down due to shortness of breath, and mild
  limitations in activities [of] daily living due to hands pain" (*id*).[26]

- Plaintiff's July 2009 hospital admission for "substance induced mood
  disorder/psychotic disorder, methadone maintenance, alcohol dependence and
  cocaine abuse" (*id*. at 22), at which time Plaintiff was described as having
  "passive suicidal ideations," "auditory hallucinations," and "vague paranoid
  ideation," and as being "coherent with poor judgment and impaired
  reliability" (*id*.); Plaintiff's emergency room visit in August 2009, for
  "threatening behavior" (*id*); and certain other of Plaintiff's hospital visits,
  including visits for drug screening tests, which were negative, and a March
  2010 visit where Plaintiff complained of depression and hearing voices (*id*.)

---

 [26] As to Dr. Revan's findings, the ALJ noted that "the medical evidence lack[ed]
information about [Plaintiff's] allegation of diagnosis of bronchitis with shortness of breath and
hypothyroidism." (*Id*.)

- The June 1, 2010 consultative, psychiatric evaluation by Dr. Schreiber, recording, *inter alia*, Dr. Schreiber's comments as to how Plaintiff had been able to travel on her own, for approximately 12 miles, for the appointment (*id.* at 23); Dr. Schreiber's notes of Plaintiff's reported symptoms, and her observations of her mood and affect (*id.*), certain of Dr. Schreiber's findings, such as her findings that Plaintiff showed "thought process [that] was coherent and goal directed with no evidence of hallucinations, delusions or paranoia"; had "fair" recent and remote memory skills, but "intact" attention and concentration; "appeared to be of borderline intellectual functioning with a slightly limited general fund of information"; and had "fair" insight and judgment" (*id.*); Dr. Schreiber's conclusion that Plaintiff "was capable of following, understanding, remembering and performing simple instructions and direction and learning new tasks," although "she might have some difficulty relating and interacting appropriately with others and dealing with stress" (*id.* at 23); and Dr. Schreiber's diagnosis of "schizoaffective disorder, bipolar disorder not otherwise specified, polysubstance dependence, in full-sustained remission[,] and history of methadone treatment." (*Id.*)

- Plaintiff's psychiatric treatment history at Montefiore Behavioral Care with Dr. Ghumman, including:  her initial visit on August 10, 2010, when Dr. Ghumman diagnosed her with "major depressive disorder with psychotic features and rule-out schizoaffective disorder" and gave her a GAF score of 50 (*id.*); Dr. Ghumman's report of December 28, 2010, that Plaintiff "had depressive mood swings, psychosis (hearing voices and feeling paranoid), sleep disturbances, [and] difficulty to focus and concentrate," was "relatively and clinically stable with treatment" with "on and off exacerbations," and had a GAF score of 55 (*id*); Dr. Ghumman's report of May 14, 2011 that Plaintiff experienced "mood swings, anger, hallucinations, sleeping difficulty, and focusing and concentrating difficulties affecting her borderline functional level," and that any stress could deteriorate Plaintiff's clinical condition (*id.*), and Dr. Ghumman's last treatment note of December 28, 2010, "at which time he reported improvement in [Plaintiff's] mental condition" (*id.*).

The ALJ also referenced the mental assessment conducted by Dr. Reddy (whom he identified as a "clinical psychologist from the State Agency) (*id.*), stating that he was granting that assessment "great weight" because it agreed with the ALJ's own RFC assessment that Plaintiff "could perform simple repetitive tasks consistent with unskilled work" (*id.*).  The ALJ stated, however, that he found Plaintiff to have "moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning[,] and moderate difficulties in

maintaining concentration, persistence and pace, without episodes of decompensation of extended duration." (*Id.*)

Finally, in summarizing how he reached his RFC determination, the ALJ stated that his assessment was "supported by the medical evidence," which, he found, reflected no objective findings to support Plaintiff's allegations of pain in her hands. (*Id.* at 24.) In this regard, he cited "unremarkable results" of X-rays of Plaintiff's hands, a reported grip strength of four out of five, and a finding that Plaintiff had full range of motion in her upper extremities. (*Id.*) He also cited evidence that Plaintiff lived independently, took care of her own personal hygiene, performed household chores, and could travel unaccompanied. (*Id.*) With respect to Plaintiff's mental impairment, the ALJ relied on the fact that, even though Dr. Schreiber's psychiatric evaluation had reported depressive mood, memory issues, and "borderline intellectual functioning," Plaintiff was found to be "coherent, oriented in all spheres, and with intact attention and concentration." (*Id.*) The ALJ also relied on Dr. Ghumman's report of "stable condition with the treatment and improvement in her global assessment of functioning from 50 to 55." (*Id.*)

In general, the ALJ concluded that, according to the medical evidence, Plaintiff was "alert, coherent with goal directed thought[] process[,] and oriented in all spheres" (*id.*), and that, although her "cognitive functioning was somewhat below average due to the limited general fund of information," she was "able to meet the basic mental demands of simple, unskilled work on a sustained basis despite the limitations resulting from her impairment" (*id.*) In sum, the ALJ found that Plaintiff had the capacity to do "routine work not requiring close interaction with others." (*Id.*)

At step four, the ALJ relied on the testimony of the VE to determine that, based on Plaintiff's RFC, she was unable to perform any past relevant work (as a "home attendant").  (*Id.*)

    **E.**    <u>**Step Five**</u>

At the fifth and final step, the ALJ once again relied, in part, on the testimony of the VE. (*Id.* at 25.)  Here, he found that in light of the Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the plaintiff was capable of performing.  (*Id.*)  Specifically, he reiterated the VE's opinion that someone with Plaintiff's RFC could perform the jobs of electrical assembler and final assembler, both of which were either light or sedentary unskilled jobs.  (*Id.*)  Finally, he found that the VE's testimony was consistent with information contained in the Dictionary of Occupational Titles ("DOT"), and concluded that Plaintiff was "capable of making a successful adjustment to other work that exist[ed] in significant numbers in the national economy."  (*Id.*)

Accordingly, the ALJ concluded that Plaintiff was not disabled, as defined by the Act. (*Id.*)

**III.**    <u>**REVIEW OF THE ALJ'S DECISION**</u>

Given that the ALJ followed the five-step procedure set forth in the Social Security regulations, this Court's review is limited to determining whether the ALJ correctly applied the relevant legal principles, and whether his decision was supported by substantial evidence.

    **A.**    <u>**Adequacy of the ALJ's Determination, at Step Three, That Plaintiff's Psychiatric Impairment Did Not Meet or Equal a Listing**</u>

As noted above, the ALJ determined, at step two of the five-step analysis, that Plaintiff had a severe psychiatric condition, specifically "major depressive disorder with psychotic features."  (*See* R. at 19.)  In order to determine, at step three, whether this condition met or equaled the pertinent listing for affective disorders (*see* n.25, *supra*), the ALJ was required, with

sufficient specificity, to determine the severity of Plaintiff mental impairment with reference to the criteria of that listing (*see id*.).  As to Plaintiff's level of functioning with respect to each of the four domains referred to in the paragraph B criteria,[27] the ALJ's finding as to the degree of Plaintiff's functional impairment ("none," "mild," "moderate," "marked," or "extreme") needed to be supported by substantial medical evidence in the record.  *See* 42 U.S.C. § 405(g); *see also Tavarez v. Barnhart*, No. 05cv2747 (DLC), 2006 WL 997701, at *4 (S.D.N.Y. Apr. 17, 2006) (noting that "[a]t step 3, an ALJ can deem a claimant disabled because of a mental disorder only on the basis of '[m]edical evidence' that is 'sufficiently complete and detailed as to symptoms, signs, and laboratory findings to permit an independent determination.'") (citing to 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(D).)  Further, the ALJ was required to apply the treating physician rule in making these findings, meaning that he was required to assign controlling weight to the opinions of Plaintiff's treating doctors, or to set out, in detail, his explanation for not assigning those opinions such weight.  *See* 20 C.F.R. § 416.927(c)(2); *Shaw*, 221 F.3d at 134.  In this process, the ALJ was not permitted merely to substitute his view for that of medical experts.  *See, e.g. Green Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

Paragraph B of Listing 12.04 requires a finding of either two "marked" limitations in the specified domains, or one "marked" limitation and "repeated" episodes of decompensation.  (*See supra*, at n.23.)  With respect to certain of the identified functional domains, the ALJ did not specifically cite to any medical evidence and did not sufficiently explain how his findings were based on the evidence, rather than on his lay opinion.  As to other domains, the ALJ appeared, without explanation, to rely on selected portions of opinions that were less helpful to Plaintiff.

---

[27] These four domains mirror the domains that, as a general matter, an ALJ must consider in both a step two and step three analysis, where the claimant is alleging a mental disability.  (*See supra* at Section I(B) and n.25.)

He also did not properly apply the treating physician rule and failed to make clear how much weight he was applying to differing medical opinions.

### 1.    Activities of Daily Living

For his finding that Plaintiff had a "moderate restriction" in her activities of daily living, the ALJ cited to the consultative examinations of Dr. Schreiber and Dr. Revan, and to Plaintiff's Function Report, without describing exactly what information from each led to his finding. (R. at 20.)  He also cited the medical records and relevant reports selectively.  For example, he stated that Plaintiff "reported that she takes care of her personal hygiene and performs some cleaning, cooking, laundry and shopping" (*id.*), but, while this statement was supported by Dr. Schreiber's June 1, 2010 evaluation (*see id.* at 306), the ALJ appears to have ignored more negative statements from Dr. Schreiber's report, such as her finding that Plaintiff  had "psychiatric problems" which might have "*significantly* interfere[d] with [Plaintiff's] ability to function on a daily basis" (*id*. at 307 (emphasis added)).  Additionally, the ALJ's finding that Plaintiff "spen[t] her days going to treatment program, watching television and doing some chores" (*id*. at 20), appears to have come from Plaintiff's Function Report, but in the same report Plaintiff reported that she was no longer able to "read, concentrate, [or] be around multiple . . . people" (*id*. at 201), and that she needed reminders to take care of her personal needs and to take medicine (*id*. at 202-03).[28]  Plaintiff also reported that she sometimes felt paranoia when she went out.  (*Id*. at 203.)  It is improper for an ALJ to adopt selected portions of statements that are

---

[28] This Court notes that the "independence" level of activities of daily living can be an important factor in determining the limitation suffered by Plaintiff.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C)(1) ("We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function.  For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision . . . .").

less supportive of a claimant's application for benefits, while simultaneously ignoring other portions of the same statements that are more supportive of the application.  *See, e.g., Lewis v. Astrue*, No. 11cv7358 (JPO), 2013 WL 5834466 (Oct. 30, 2013) (noting that even the existence of supportive conclusions in a medical source statement "does not permit the ALJ to cherry-pick which documents and evidence he looks at, ignoring some and using others); *accord Pereyra v. Astrue*, No. 10cv5873 (DLI), 2012 WL 3746200, at *14 (E.D.N.Y. Aug. 28, 2012).

The ALJ also cited to Dr. Revan's evaluation, which did give a brief description of Plaintiff's daily activities, but Dr. Revan's opinion that Plaintiff had "mild limitations with activities of daily living secondary to her hand pain" did not take into account Plaintiff's mental impairments.  (*See* R. at 324 (Dr. Revan specifically noting, on internal medicine examination, that there was "[a] separate psychological evaluation to follow").)  The consulting psychologist, Dr. Reddy, appears to be the only medical professional to have directly opined on the severity of Plaintiff's limitations in her activities of daily living, and he found that Plaintiff had mild restrictions of activities of daily living (*see id*. at 344), a finding which the ALJ did not cite.  The ALJ also made no mention here of the statement of Dr. Ghumman, Plaintiff's treater, that Plaintiff had "emotional and behavioral exacerbations on and off affecting her baseline routine life" (R. at 371),[29] and certainly made no attempt to ascertain what Dr. Ghumman meant by

---

[29] While the ALJ did refer to Dr. Ghumman's records in his RFC determination, that is insufficient to inform the Court whether he considered them at step three and, if so, the weight he accorded them.  *See Kohler v. Astrue*, 546 F.3d 260, 268 (2d Cir. 2008) ("the ALJ's decision discusse[d] much of the relevant evidence primarily in the context of [the plaintiff's] residual functional capacity to perform work and not in the context of the four functional areas identified by the regulations . . . [and] [t]hus it is not clear whether the ALJ adequately considered the entire record when determining the severity of [plaintiff's] impairment); *see also Benjamin v. Astrue,* No. 11cv2074 (NGG), 2013 WL 271505, at *5-6  (E.D.N.Y. Jan. 23, 2013) (quoting *Kohler*).

referencing an effect on Plaintiff's "baseline routine life" or how severe he believed that effect to be. *See, e.g., Pabon v. Barnhart,* 273 F. Supp. 2d 506, 514 (S.D.N.Y.2003) ("The duty to develop a full record compels the ALJ to obtain from the treating source expert opinions as to the nature and severity of the claimed disability," citations and alterations omitted).

Thus, while the ALJ did cite to certain records in this section, he ignored other records of seemingly equal relevance, and he cited *no* report of *any* treater or other medical source who had arrived at the conclusion he did – that Plaintiff was "moderately" limited in her activities of daily living.  Even if the ALJ have had valid reasons for making such a finding, he did not adequately explain those reasons.

### 2.   <u>Social Functioning</u>

The ALJ did not cite to any specific support for his finding that Plaintiff had "moderate difficulties" in social functioning, other than to note Plaintiff's statements that "she lives alone, but her fiancé visits on a regular basis."  (R. at 20.)  Although the ALJ also stated that Plaintiff had "no documented pattern of maladaptive behavior and related well with her fiancé" (*id.* at 20), his rationale for that conclusion is unclear.

It seems obvious that the ALJ did not rely on the finding of Dr. Reddy that Plaintiff had only a "mild" degree of limitation as to social functioning (*see id.* at 344), as the ALJ's determination was different, and he did not even refer to Dr. Reddy's finding in this regard.  It also seems clear that the ALJ did not rely on – and perhaps did not even consider at this point – evidence in the Record suggesting that Plaintiff had in fact displayed "maladaptive behavior." Such evidence included Dr. Schreiber's notation that Plaintiff had reported a lack of friends and close family relationships (*id.* at 306) and "appear[ed] to have some difficulty being able to relate to and interact appropriately with others" (*id.* at 307).  The Record also contained repeated

notations by Plaintiff's treating psychiatrist, Dr. Ghumman, that Plaintiff suffered from paranoia (*id*. at 371, 374) and had anger issues and mood swings (*id*. at 374).  It also contained medical records from St. Barnabas Hospital, indicating that Plaintiff had been hospitalized after threatening her neighbors.  (*Id.* at 263.)

Overall, it unclear to this Court how the ALJ reached his determination that Plaintiff had "moderate" limitations in her social functioning, as he offered no explanation, and as evidence exists in the Record that would support a finding of a less severe or, potentially, a more severe limitation in this domain.  *See* 20 C.F.R. § 416.920a(e)(4) ("The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)."); *see also Benjamin v. Astrue*, No. 11cv2074 (NGG), 2013 WL 271505, at *5 (E.D.N.Y. Jan. 23, 2013) (finding error where the ALJ made conclusions about severity in each of the four functional groups, but did not cite to "evidence nor provide any substantive analysis in support of these conclusions," as the ALJ was "obligated to provide *specific findings* justifying each of these rankings." (emphasis in original) (citations omitted)).

### 3.    Concentration, Persistence, or Pace

As to his finding that Plaintiff had "moderate difficulties" in maintaining concentration, persistence, or pace, the ALJ only stated that he had relied on the consultative report of Dr. Schreiber.  (*Id.*)  Dr. Schreiber's report did contain certain findings regarding concentration (*see id.* at 306 (finding that Plaintiff's attention and concentration [were] intact" as she "was able to count forward and backwards," and "could do simple calculations and serial 3's")), but the ALJ did not explain the weight he applied to Dr. Schreiber's opinion.  Nor did he even mention any other evidence in the Record with respect to this domain, even though "great care" must be

exercised in "reaching conclusions about [a claimant's] ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination or psychological testing by a clinician."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C)(3).

Dr. Reddy had actually concluded that Plaintiff had moderate limitations in this domain (*id*. at 344), but, again, the ALJ did not even cite to Dr. Reddy's opinion as part of this analysis. The ALJ also appeared to ignore entirely the relevant opinions of Dr. Ghumman, Plaintiff's treater.  Dr. Ghumman did not directly opine as to the level of Plaintiff's difficulties in terms such as "mild," "moderate," or "marked," but he did specifically express the view that Plaintiff had problems with focus and concentration.  (*See e.g., id*. 371 (finding that Plaintiff had difficulty focusing and concentrating); *id*. at 374 (stating plaintiff had difficulty focusing and concentrating that "affect[ed] her baseline functional levels" as well as paranoia, mood swings, anger issues, depression and hallucinations).)  As previously discussed, the ALJ has a duty to develop the record and attempt "to obtain from the treating source expert opinions as to the nature and severity of the claimed disability."  *Pabon,* 273 F. Supp. 2d at 514.

Thus, as to Plaintiff's ability to maintain concentration, persistence and pace, the ALJ both failed to analyze the weight that should have been accorded to the opinions of the different medical sources, and failed to explain how he reached the conclusion that Plaintiff was "moderately" limited in this domain.  *See Lewis v. Astrue*, No. 11cv7538 (JPO), 2013 WL 5834466, at *30-31 (S.D.N.Y. Oct. 20, 2013) (finding error where "the ALJ did not explain the logical connection between the evidence he cited and his conclusions").

### 4. <u>Episodes of Decompensation</u>

Finally, the ALJ stated that there were "no partial or complete hospitalizations" after the alleged onset date in the Record,[30] as the basis for finding that Plaintiff had "experienced no episodes of decompensation of extended duration." (R. at 20.)  The ALJ seems to have employed an overly narrow definition of "episodes of decompensation," by equating such episodes with hospitalizations.  That view would not even be supported by the Social Security Administration's own definition, which states that "episodes of decompensation"

> are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.  Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two).  Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (*e.g.*, hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

United States Social Security Administration, Disability Evaluation Under Social Security § 12.00 *available at* http://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm (last visited Jan. 12, 2015); *see also Kohler*, 546 F.3d at 266 n.5.

As noted above, Dr. Ghumman stated that Plaintiff had experienced "emotional and behavioral exacerbations on and off affecting her baseline routine life."  (R. at 371.)  While it may be unclear from that description whether the "exacerbations" of Plaintiff's symptoms reached the level of "episodes of decompensation," the ALJ had a duty to develop the record,

---

[30] The Record did include reports of hospitalizations prior to the alleged onset date (*see id*. at 234-65).

which would have included contacting Dr. Ghumman if necessary to clarify the matter.[31]

*See, e.g ., Calzada v. Astrue,* 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) ("[I]f a physician's

finding in a report is believed to be insufficiently explained, lacking in support, or inconsistent

with the physician's other reports, the ALJ must seek clarification and additional information

from the physician to fill any clear gaps before dismissing the doctor's opinion."); *accord*

*Stemmermann v. Colvin*, No. 13cv241 (SLT), 2014 WL 4161964, at *8 (E.D.N.Y. Aug. 19,

2014).  Additionally, the ALJ also did not appear to consider Dr. Reddy's finding that Plaintiff

suffered from "one or two" episodes of decompensation (*id*. at 344).

        In sum, as to all four functional areas, this Court is unclear as to how the ALJ weighed

the medical opinions in the Record, and cannot "discern whether the ALJ properly considered all

evidence relevant."   *Kohler*, 546 F.3d at 269.  For these reasons, remand is appropriate.  *See id*.;

*accord Silberman v. Astrue*, No. 08cv03398 (RMB) (THK), 2009 WL 2902576, at *6-7

(S.D.N.Y Aug. 14, 2009) (noting that a court may not "affirm an administrative action on

grounds different from those considered by the agency," and, where an agency's rationale is not

set forth with "such clarity as to be understandable," a court cannot appropriately review it),

*report and recommendation adopted by* 2009 WL 2778245 (Sept. 1, 2009); *see Benjamin*,

2013 WL 271505 at *6-7.[32]

---

[31] The ALJ also had an obligation to fill in any gaps in the medical record, particularly if there were gaps in records from a physician with whom Plaintiff had a close and important treatment relationship.  On this point, the Court notes that the medical records obtained from Dr. Ghumman state that he saw Plaintiff on December 4, 2010 (R. at 371), but the records of that visit appear to be missing.  If this case is remanded because of legal error, then, upon remand, the ALJ should seek those missing records, so that he may review Plaintiff's complete treatment history with Dr. Ghumman.  *See* 20 C.F.R. § 416.912(d).

[32] This Court also notes that the ALJ did not describe whether Plaintiff met the paragraph A criteria for Listing 12.04 (which would have been a necessary inquiry, had Plaintiff been found to meet the paragraph B criteria (*see* n.25, *supra*)), and, with regard to the

B.    **Adequacy of the ALJ's RFC Determination**

The ALJ's RFC determination suffers from a similar defect, as this Court is unable to ascertain the ALJ's rationale for that determination, and is therefore unable to review the ruling. Here, while the ALJ described many portions of the medical records (*see* R. at 21-24), it is not clear how much weight he accorded to each medical opinion expressed in those records or how he reached his conclusion as to Plaintiff's RFC.

The only medical source opinion as to which the ALJ specifically discussed an assigned weight was the opinion of the consulting psychologist, Dr. Reddy, to which he accorded "great weight."  (*Id.* at 23.)  Defendant concedes, however, that giving great weight to Dr. Reddy's opinion was "improper," as the ALJ's only stated reasoning for doing so was that Dr. Reddy's opinion – *i.e.*, that Plaintiff was "capable of the basic functional requirements of unskilled work in a low stress environment" (R. at 311) – was "in agreement with the ALJ's own findings" (Def. Mem., at 18; *see* R. at 23)[33]).  Defendant argues that this error does not require remand, as Dr. Reddy's "opinion was in general agreement with the treating and examining source opinion evidence."  (Def. Mem., at 19.)  It is not clear, though, that the ALJ would have made reached the same conclusion, had he adhered to the regulations and properly evaluated the weight that

_____

paragraph C criteria, the ALJ merely stated summarily that Plaintiff did not meet them, without referring to any evidence.  If, upon remand, the ALJ were to determine that the paragraph B criteria are actually satisfied, then he should be directed to proceed to consider the paragraph A criteria.  If one or the other of those two sets of criteria are still not satisfied, then the ALJ should also consider, with reference to the Record, whether Plaintiff meets the criteria set out in paragraph C.

[33] Specifically, the ALJ stated that "[g]reat weight is granted to the mental assessment dated July 16, 2010, by Dr. V Reddy, clinical psychologist from the State Agency, *since the same agrees with the undersigned [ALJ's] conclusion* that [Plaintiff] could perform simple repetitive tasks consistent with unskilled work."  (R. at 23 (emphasis added).)

should have been assigned to each of the medical opinions in the Record, and thus this Court cannot conclude that the great weight placed on Dr. Reddy's opinion was harmless error.

Further, while, in making his RFC determination, the ALJ appears to have focused on Dr. Ghumman's December 28, 2010 findings that Plaintiff was "stable" and showed an improvement in her GAF score,[34] it is not evident that Dr. Ghumman's findings in this regard actually supported the ALJ's determination.

First, while the ALJ stated that Dr. Ghumman had reported Plaintiff to be in "stable condition" (*see* n.34, *supra*), the full context of Dr. Ghumman's notes indicate (as noted above and as the ALJ recognized elsewhere in his decision (*see* R. at 23)) that, while Plaintiff's condition was "relatively clinically stable on treatment," she still had "emotional and behavioral exacerbations on and off affecting her baseline routine life" (*id.* at 371). Especially given this context, it would have been error for the ALJ simply to equate a finding of "stability" with an ability to work. *See e.g. Kohler v. Astrue*, 546 F.3d 260, 268 (2d Cir. 2008) (finding it was error for the ALJ to "consistently interpret[] reports that [claimant's] condition ha[d] been 'stable' to mean that [claimaint's] condition ha[d] been good, when the term could mean only that her condition has not changed, and she could be stable at a low functional level").

Second, even assuming that it was proper for the ALJ to have considered Plaintiff's GAF score in making his RFC determination (*see* n.6, *supra* (noting that the DSM-V has dropped the

---

[34] After briefly describing Dr. Ghumman's May 14, 2011 findings that Plaintiff suffered from "paranoia, mood swings, anger, hallucinations, sleeping difficulty, focusing and concentrating difficulties affecting her borderline functional level" and that "any stress could deteriorate her clinical condition," the ALJ specifically noted that "the last treatment by Dr. Ghumman was on December 28, 2010, at which time he reported improvement in the [Plaintiff's] condition." (*Id.* at 23.) Later in his opinion, the ALJ clarified that, in the same December 28, 2010 findings, "Dr. Ghumman reported stable condition with the treatment and improvement in her global assessment of functioning from 50 to 55." (*Id.* at 24.)

use of the GAF scale)), the ALJ should not have used such a score to supplant the tester's more

negative findings, *cf. Santiago v. Colvin*, No. 12cv7052 (GBD) (FM), 2014 WL 718424, at *20

(S.D.N.Y. Feb. 25, 2014) (noting that an ALJ "need not afford controlling weight to the GAF

score, especially if it conflicts with the test administrator's other observations"), *report and*

*recommendation adopted by* 2014 WL 1092967 (S.D.N.Y. Mar 17, 2014).  Here, on the same

day that Dr. Ghumman recorded a GAF score of 55 for Plaintiff, Dr. Ghumman also stated that

Plaintiff "still experience[d] depression [and] anxiety, still hear[d] voices (less in severity and

frequency), still [felt] paranoid, . . . [and still had] difficulty . . . focus[ing]."  (R. at 370-71.)  In

all, Dr. Ghumman concluded that Plaintiff "seem[ed] to suffer from chronic mental illness."  (*Id.*

at 371.)  Further, if the ALJ detemined that any findings noted by Dr. Ghumman regarding the

severity of Plaintiff's impairments were in conflict with the GAF score he reported for her, or

with any other aspect of his psychiatric assessment, then the ALJ had a duty to develop the

record, rather than merely disregard or assign lower weight to Dr. Ghumman's opinions.  *See e.g.*

*Santiago v. Commissioner of Social Sec.*, No. 13cv1464 (MKB), 2014 WL 4793448, at *11-13

(E.D.N.Y. Sept. 25, 2014).[35]

Defendant argues that the ALJ's RFC finding that Plaintiff was only capable of

performing "simple repetitive work with only occasional contact with co-workers and no contact

with the public" incorporated Dr. Ghumman's opinion that Plaintiff suffered from difficulty

focusing and concentrating and that any stress could deteriorate her condition.  (*See* Def. Mem.,

at 17.)  Similarly, Defendant argues that, by "limiting Plaintiff to the most basic work from a

---

[35] Defendant also argues that "Dr. Ghumman declined to provide an opinion about
Plaintiff's specific mental limitations" (Def. Br., at 17), but this argument is unavailing in light
of the ALJ's affirmative duty to develop the record.  *See* SSR 85-16 ("when medical source notes
appear to be incomplete, recontact with the source should be made to attempt to obtain more
detailed information").

mental standpoint with no more than occasional contact with others," the ALJ accounted for Dr. Schreiber's "assessment that Plaintiff's psychiatric impairments significantly affected her ability to function on a daily basis and that she had a history of difficulty making appropriate decisions, relating to and acting appropriately with others and with stress." (*Id.*)  Yet, while the ALJ did list the opinions of Drs. Ghumman and Schreiber in the section of his decision addressing Plaintiff's RFC, the ALJ similarly listed a great deal of other reports and records there, without providing sufficient analysis connecting the cited evidence to his RFC determination.  Where an ALJ "simply state[s] his RFC finding and broadly cite[s] to multiple exhibits in the record," but does not "provide[ ] . . . connecting analysis," the matter should be remanded.  *De Leon v. Colvin*, No. 13cv4540 (FB) 2014 WL 4773966 (E.D.N.Y. Sept. 24, 2014).  Here, the ALJ's brief analysis section (*see* R. at 24) is insufficient to allow the Court to review the ALJ's RFC determination.

The question for this Court is whether the ALJ's decision – as the final decision of the Commissioner, and in light of all the evidence in the Record – demonstrates that the Commissioner's determination rested on an application of correct legal standards.  As, in connection with determining Plaintiff's RFC, the ALJ improperly applied great weight to Dr. Reddy's opinion, and provided no explanation as to the weight that he assigned to any other medical opinions, including the opinions of Plaintiff's treating psychiatrist, I recommend that this case be remanded for further consideration of the effect of her mental impairments on her residual capacity to work.[36]  *See Kohler*, 546 F.3d at 268 (2d Cir. 2008) (remanding where, *inter*

---

[36] I do not recommend that Plaintiff's claim be remanded for further consideration of her physical impairments, as Plaintiff's motion before this Court focused solely on the ALJ's decision with respect to her mental impairments, raising no objection to the ALJ's findings regarding her physical impairments.

*alia*, it was "not clear whether the ALJ would have arrived at the same conclusion regarding [the claimant's] residual functional capacity to perform work had he adhered to the regulations"); *accord Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir. 1996) ("When there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.  Remand is particularly appropriate where, as here, we are unable to fathom the ALJ's rationale in relation to the evidence in the record without further findings or clearer explanation for the decision." (internal citations and quotation marks omitted)).

### C.    **Substantial Evidence Review**

As discussed above, Defendant's brief is focused on arguing that the ALJ's decision is supported by substantial evidence in the Record.  (*See* Def. Mem., at 12-25.)  Where, however, remand is appropriate because the Court cannot determine whether the law was properly applied by the Commissioner, the Court should not, prior to remand, attempt to assess whether substantial evidence in the record supports the ultimate disability determination.  *See, e.g.*, *Silberman v. Astrue*, No. 08cv03398 (RMB) (THK), 2009 WL 2902576, at *11, 14 (S.D.N.Y Aug. 14, 2009), *report and recommendation adopted by* 2009 WL 2778245 (Sept. 1, 2009). Accordingly, at this juncture, the Court should not attempt to make this assessment with respect to Plaintiff's mental impairments.

### <u>CONCLUSION</u>

For all of the foregoing reasons, I respectfully recommend granting Plaintiff's motion for judgment on the pleadings (Dkt. 12), to the extent that her claim be remanded for:

> (1)    further consideration, at step three of the sequential evaluation, of whether Plaintiff's identified psychological impairment of "major depressive disorder with psychotic

> features" meets or equals the Listing 12.04, for affective
> disorders, and

(2)    further consideration of Plaintiff's RFC,

and that Defendant's cross-motion (Dkt. 16) be denied.

I further recommend that, upon remand, the ALJ be specifically directed – both in connection with evaluating Plaintiff's level of functioning in each of the domains relevant to Listing 12.04, and in evaluating Plaintiff's RFC – to reconsider the evidence in the Record regarding Plaintiff's mental impairments in accordance with 20 C.F.R. § 416.927(c) regarding the weighing of medical opinion evidence, to set forth his reasoning for assigning particular weight to that evidence, and to develop the Record as necessary to fill in any gaps or to clarify medical findings.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See also* Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Colleen McMahon, United States Courthouse, 500 Pearl Street, Room 1640, New York, NY 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, NY 10007.  Any requests for an extension of time for filing objections should be directed to Judge McMahon.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  *See Thomas v. Arn,* 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson,*

968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988);

*McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
      January 26, 2015

Respectfully submitted,

_____
DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Hon. Colleen McMahon, U.S.D.J.

All counsel (via ECF)